Estate of Dr. W. M. Watkins, Deceased, Ruth Young Watkins, Executrix, and Ruth Young Watkins, Individually v. Commissioner.
Estate of Watkins v. Commissioner
Docket No. 60349.
United States Tax Court
T.C. Memo 1958-127; 1958 Tax Ct. Memo LEXIS 102; 17 T.C.M. (CCH) 674; T.C.M. (RIA) 58127; June 30, 1958
*102 Lee S. Jones, Esq., Kentucky Home Life Building, Louisville, Ky., for the petitioners. Charles R. Hembree, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined the following deficiencies in and additions to petitioners' income tax: Additions
Year
Deficiency
Sec. 293(b)
1943
$10,972,57
$5,486.29
1944
11,291.22
5,645.61
1945
11,557.96
5,778.98
1946
8,343.37
4,171.69 The issues to be resolved are (1) whether the statute of limitations bars the deficiencies determined and, if not, (2) whether petitioners understated their income in each year, and (3) whether each deficiency is due to fraud with intent to evade tax. Findings of Fact Certain facts have been stipulated and are hereby found. Petitioner Ruth Young Watkins, hereafter referred to as petitioner, and W. M. Watkins, hereafter referred to as decedent, were husband and wife from January 1, 1943 through September 16, 1946, when decedent died. Petitioner and decedent filed joint Federal income tax returns for calendar years 1943, 1944 and 1945 with the collector of internal revenue for the district of Kentucky on March *103 15 of each following year. For 1946, petitioner on March 15, 1947 filed with that collector a joint return for herself and decedent's estate, of which she had qualified as executrix. The returns followed the cash receipts and disbursements method. Decedent conducted his medical practice in Louisville for more than 40 years until his death. Decedent and petitioner married in October 1942 after he divorced his former wife in September 1942. From 1943 until his death at the age of 74, decedent suffered from ill health, which curtailed the time spent at his practice. During 1944, he and petitioner moved to a nearby farm in hopes of improving his health. During 1945, he made two trips to New Orleans for health purposes. Decedent and petitioner owned rental property, corporate stocks and United States bonds from which they derived the following income during 1943 through 1946: Year
Amount
1943
$1,639.76
1944
1,999.57
1945
1,167.16
1946
1,485.92 In 1944, they purchased and began operating a farm. They suffered losses from their farming operations of $1,769.11, $2,398.64 and $840.73 in 1944, 1945 and 1946, respectively. On January 17, 1941, decedent purchased *104 real estate for $4,000. On January 23, 1941, he borrowed $3,000 and executed a mortgage on that property. The mortgagee received the regular monthly payments on the mortgage loan. Decedent devised this property to his son. In 1940, petitioner purchased real estate on which she installed certain improvements at a total cost for purchase and improvements in excess of $6,000. Petitioner borrowed a portion of that amount. Petitioner received personalty totaling $4,026.07 from the estate of an uncle in 1936. In 1946, she received personalty of $737.70 from a trust established under the will of another uncle. In 1943, petitioner received personalty totaling $1,384.63 from the estate of an aunt. She had also inherited about $15,000 from her father who died in 1923. In the latter part of 1942, decedent made cash gifts to petitioner totaling about $60,000. Petitioner worked continuously from about 1913 through 1944. Until 1924, she resided with her parents. In 1925, she came to Louisville, Kentucky, where she held various positions, while maintaining her own apartment prior to her marriage to decedent. From about 1932 through 1944, a Louisville distillery continuously employed petitioner. *105 She received salaries from that firm of $1,682.42 in 1943 and $2,453.48 in 1944. The following schedule shows the changes in the combined net worth of petitioner and decedent for the years 1943 through 1946 without allowing for cash on hand: Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1942
1943
1944
1945
1946
Cash in banks
$ 2,038.89
$ 534.25
$ 4,235.86
$ 1,888.56
$10,219.67
Real estate
21,390.00
21,390.00
39,390.00
43,684.00
39,684.00
Furniture and fixtures
875.00
1,934.50
2,659.10
3,239.00
3,478.65
Notes receivable
1,763.00
1,619.00
0
3,250.00
0
U.S. Government bonds
375.00
4,668.75
3,168.75
3,543.75
4,293.75
Other securities
12,762.58
12,762.58
12,762.58
12,762.58
12,762.58
Farm equipment and animals
0
0
3,481.07
10,984.88
0
Total assets
$39,204.47
$42,909.08
$65,697.36
$79,352.77
$70,438.65
Mortgage payable
$ 2,683.94
$ 2,480.24
$ 2,328.35
$ 2,126.47
$ 2,021.34
Reserve for depreciation
1,270.40
1,837.51
2,699.79
3,997.89
4,110.14
Total liabilities
$ 3,954.34
$ 4,317.75
$ 5,028.14
$ 6,124.36
$ 6,131.48
Net worth - December 31
$35,250.13
$38,591.33
$60,669.22
$73,228.41
$64,307.17
Net worth - January 1
35,250.13
38,591.33
60,669.22
73,228.41
Net worth increase
$ 3,341.20
$22,077.89
$12,559.19 *
($ 8,921.24)
*106 Petitioner and decedent made nondeductible personal expenditures of $2,400 in each year 1943 through 1946. In addition, they paid Federal income taxes of $367.62 and $232.96 in 1944 and 1945, respectively. The joint returns filed by petitioner and decedent for 1943 through 1945 and by petitioner and decedent's estate for 1946 showed the following amounts of net income: Year
Amount
1943
$2,244.34
1944
3,465.18
1945
568.88
1946
1,106.15 Respondent issued a statutory notice of deficiency on September 6, 1955 in which he determined deficiencies by the net worth plus nondeductible expenditures method. None of the returns filed by petitioner and decedent for the years 1943 through 1946 werde false or fraudulent with intent to evade tax. Opinion The statute of limitations bars the determination of any of the deficiencies involved unless respondent proves that the returns were false or fraudulent with intent to evade tax. , affd. (C.A. 6) ; . Respondent, to satisfy that burden, does not contend that any specific item of income *107 or deduction has been fraudulently treated. Rather, he argues that a comparison of the income reported with the increases in net worth and nondeductible expenditures shows gross understatements of income and that such understatements amply evidence fraud. Although other possible indicia of fraud are suggested, respondent's position is clearly based on the understatements. The net worth computation finally relied upon by respondent consists of items wholly stipulated with the exception of cash on hand, living expenses, certain real estate for each year, and certain furniture and fixtures in 1942. Respondent allowed no cash at the end of 1942, $20,000 in 1943, $16,000 in 1944, $25,500 in 1945, and $45,103.43 in 1946 and estimated living expenses of $5,000 in each year. This is not the frequently encountered case where the actual closing cash total is known, with only the opening figure in dispute. The record reveals no actual count as of any date. The closing figure is explained by the revenue agent as an undisclosed amount on hand sometime in 1952 increased by known cash expenditures and an amount of estimated living expenses. The closing cash amounts for each year 1943 through *108 1945 resulted from the agent's efforts to "spread the cash that we had on hand at the end of 1946 back evenly over those years in order to even out the income and so as not to burden down one year with too much of the tax." The entire approach to the cash balances is merely compounded assumptions. Petitioner must establish that proven net worth increases are not attributable to unreported income, , affirming a Memorandum Opinion of this , certiorari denied . But where respondent relies on net worth increases to prove fraud, he must establish the correct net worth items, including cash on hand. On this record, neither the closing cash amount nor the amounts attributed to the intervening years have any factual basis whatsoever. Accumulated cash or nontaxable receipts could account for all of the alleged understatements. Similarly, unreported income in one of the years in issue might eliminate the understatements in other years. As the determination for each year and respondent's burden with respect to it must stand on its own facts, the approach employed here fails *109 to prove an understatement in any specific year. . Respondent also erred in failing to allow for any opening cash. Respondent bases his conclusion that large amounts of unreported income were received during these years on decedent's acquisition of a $4,000 tract of real estate with the aid of a $3,000 mortgage. Although such borrowing might be some indication of cash shortage, an isolated credit purchase of this type falls short of being the clear and convincing proof required. Cf., e.g., (March 24, 1958); ; . And this is so without considering whether respondent be correct in the factual dispute over the real party in interest in that property. Although neither petitioner nor decedent may have required sizable amounts of cash in their day-to-day operations, it is difficult to believe that even nominal purchases would require drawing on their bank accounts or credit. The factual dispute over cash on hand centered entirely on petitioner's separate cash resources. After duly considering *110 the evidence presented, we have generally accepted her account and have found the facts accordingly. Had respondent prevailed in that factual dispute, a major gap in his presentation would still remain, the unrefuted possibility of accumulation of resources by decedent. Apparently, respondent regards decedent's medical practice as a likely source of income. Respondent's position must be that decedent accumulated no cash whatsoever during 40 years of practice and 70 years of life, but accumulated sizable sums during the last 4 years before his death. During those last years decedent was in such ill health that he had to curtail his practice, move to a farm, and take trips for health purposes. To this series of illnesses decedent ultimately succumbed. Respondent's timing of the cash accumulation is logically unsupportable. Under the facts presented, we conclude that respondent has not "negatived" the existence of substantial amounts of cash on hand at January 1, 1943, derived from sources not taxable during the disputed years. Cf. ; . Although it probably could not in *111 itself affect the outcome, we also reject respondent's estimates of living expenses. That determination suffers from the same weaknesses as the determination of the closing cash. It is based on a "back cast" of an undetailed amount expended in a later year. Without proof of the specific items and that they approximated those incurred in earlier years, no logical connection exists. As to the other two disputed items in the net worth computation, we have found the facts in favor of respondent. Those items, however, are comparatively insignificant, and cannot affect the result. Because respondent has not established the cash on hand and living expense items, the net worth computation he relies on cannot be accepted as accurate. Because the net worth computation is not accurate, the understatements of income based thereon cannot be found. Because those understatements cannot be found, respondent has not proved that the returns filed were false or fraudulent with intent to evade tax. And finally, because those returns cannot be found to be false or fraudulent and the statute of limitations otherwise bars the deficiencies, we need consider neither the correctness of the deficiencies *112 determined nor of the proposed additions to tax. Decision will be entered for the petitioners. Footnotes
*. Decrease.↩